## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
)
**MARY GORECKI**               )
**3186 RENARD LANE**       )
**ST. CHARLES, IL 60175**    )
)
      **Plaintiff,**           )
)
**v.**                       )    **Case No: 24-3168**
)
)
**THE HON. MERRICK GARLAND** )
**U. S. DEPARTMENT OF JUSTICE** )
**950 PENNSYLVANIA AVE., NW** )
**WASHINGTON, D.C. 20530-0001** )
)
)
)
      **Defendant.**         )
_____ )

## <u>COMPLAINT</u>

### A. INTRODUCTION

This complaint seeks to remedy, pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e, *et seq.* (2024), ("Title VII"), and the Age Discrimination in Employment Act of

1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), the illegal discriminatory conduct that the plaintiff,

Mary Gorecki ("Ms. Gorecki"), a current United States Department of Labor employee, who

worked formerly for the United States Department Of Justice ("DOJ"), Community Relations

Service ("CRS") for over thirteen exemplary years, endured while working at CRS. CRS's

discriminatory conduct was based upon race (Ms. Gorecki is Caucasian), gender (she is female)

and age (she is over 50). CRS compounded its illegal conduct by creating a hostile work

environment, retaliating against Ms. Gorecki for filing EEO complaints, and eventually forcing

Ms. Gorecki to leave CRS based upon the incredibly intolerable working conditions that CRS imposed upon her, *i.e.*, CRS constructively discharged Ms. Gorecki. Thus, after over thirteen years of an exemplary performance with CRS, including being the only Caucasian woman to serve as a regional director in CRS' sixty-year history and receiving the Attorney General Honors Award, Ms. Gorecki moved to the United States Department of Labor because of CRS' repeated, voluminous, and significant violations of Title VII and the ADEA.

## B. JURISDICTION

Since Ms. Gorecki initiates this lawsuit pursuant to Title VII and the ADEA, jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331. *See* 28 U.S.C. § 1331; *see also* 42 U.S.C. § 2000e-16; 29 U.S.C. § 633a(a).

## C. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Ms. Gorecki exhausted her administrative remedies. On September 27, 2022, she filed a timely informal complaint with the United States Department of Justice, Offices, Boards & Divisions, Justice Management Division ("JMD") alleging retaliation and race, gender, and age discrimination. *See* Exhibit A, p. 1. Receipt by JMD was acknowledged on September 27, 2022, and the matter was eventually assigned an internal case number of OBD-2022-001119. *See Id.*, p. 2. A JMD EEO staff attorney was assigned to investigate Ms. Gorecki's informal complaint from September 2022 - December 2022. On December 21, 2022, the staff attorney issued Ms. Gorecki a notice of right to file a formal complaint with JMD. *See* Exhibit B. Ms. Gorecki acknowledged receipt of the notice and timely filed a formal complaint with JMD on January 3, 2023. *See* Exhibit C. Receipt was acknowledged and the formal complaint process proceeded. *See* Exhibit D, p. 1.

Complaint
Page 2

On January 23, 2023, JMD accepted all counts of the plaintiff's complaint for investigation. *See Id.* The plaintiff submitted additional ongoing discriminatory conduct on February 23, 2023, and on July 21, 2023. These additional complaints were accepted as amendments to the plaintiff's original formal complaint. All original counts and new counts were accepted and investigated. *See* Exhibit E. The investigation of the formal complaints concluded on December 1, 2023. JMD issued a Report of Investigation ("ROI") to Ms. Gorecki on December 1, 2023. *See* Exhibit F. On December 3, 2023, Ms. Gorecki acknowledged receipt of the ROI and made a written request for a Final Agency Decision ("FAD") without hearing. *See* Exhibit G. The formal complaint was assigned in December 2023 to the U.S. Department of Justice, Civil Rights Division, Complaint Adjudication Office (CAO) for a final agency decision.

On August 1, 2024, more than seven months after the assignment of Ms. Gorecki's complaint to the CAO, Ms. Gorecki inquired as to the status of the FAD. On August 1, 2024, the CAO indicated they had not even assigned an attorney for review of the complaint and their backlog of cases exceeded 600 cases. *See* Exhibit H, p. 2. On August 14, 2024, because the CAO had not even provided an estimate regarding when the CAO would issue the FAD in Ms. Gorecki's case, Ms. Gorecki notified the CAO that she would be proceeding to United States District Court after having exhausted all administrative remedies. *See* Exhibit I. On August 14, 2024, the CAO acknowledged receipt of the notice to proceed to United States District Court and provided a written order of dismissal of her formal complaint. *See* Exhibit J. Consequently, Ms. Gorecki filed this lawsuit in a timely manner.

### D. VENUE

With respect to Ms. Gorecki's Title VII claims, the unlawful employment practices

Complaint
Page 3

occurred in the District of Columbia and the employment records relevant to such unlawful

practices are maintained in the District of Columbia.  Therefore, the venue for Ms. Gorecki's

Title VII claims is proper in this district.  *See* 42 U.S.C. § 2000e-5(f)(3).  Venue is also proper in

this district for Ms. Gorecki's ADEA claims because the United States Department of Justice

resides in this district and a substantial part of the events resulting in this action occurred in the

District of Columbia.  *See* 28 U.S.C. § 1391(b)(1)-(b)(2).

## E.  PARTIES

1.    Plaintiff, Mary Gorecki, is a fifty-seven-year-old white, Caucasian female who

resides in St. Charles, Illinois.  She was employed by the United States Department of Justice

("DOJ") in the Community Relations Service ("CRS") from March 28, 2010, to June 2, 2023.

2.    Defendant, the Honorable Merrick Garland, is being sued in his official capacity as

DOJ's Attorney General.  DOJ is composed of more than 40 separate component organizations

and more than 115,000 employees. Headquartered at the Robert F. Kennedy Building in

Washington, D.C., the Department maintains field offices in all states and territories across the

United States and in more than 50 countries around the world. CRS is a component of DOJ and

works with community groups to resolve community conflicts based upon race, color, and

national origin and to prevent and to respond to alleged hate crimes arising from differences of

race, color, national origin, gender, gender identity, sexual orientation, religion, or disability.

## F.  FACTUAL ALLEGATIONS

3.    Ms. Gorecki graduated from Tufts University in 1988 with a degree in political

science.

4.    She then attended law school at the University of Illinois, Chicago and graduated in

1991 with a JD. She passed the Illinois bar and was licensed to practice in November 1991.

5.    Ms. Gorecki became a prosecutor in Kane County, Illinois from 1991-1995, and then entered private practice until 2000.

6.    In 2000, Ms. Gorecki was elected State's Attorney for Kane County, Illinois and, reentered the private sector from 2004 to 2010.

7.    Ms. Gorecki then joined the Department of Justice, Community Relations Service on March 28, 2010, and remained there until her constructive discharge on June 2, 2023.

8.    Ms. Gorecki served as a Regional Director at CRS with honor and distinction.  Her performance was at the highest rating for all regional directors.  She received numerous outstanding performance awards, Regional Director of the year awards, regional team of the year awards, and an Attorney General Honors award.

9.    Ms. Gorecki also served simultaneously as the Regional Director for multiple regions and served as Acting Associate Director and Acting Deputy Director for CRS on several occasions.

10.    From 2020-2022 Ms. Gorecki was the most senior ranking Regional Director at the CRS.

11.    She received outstanding performance awards, on the spot awards, quality step increases, and special act awards every year during her thirteen-year tenure at CRS.

12.    Ms. Gorecki was the only white female in the (then) fifty-eight-year history of CRS to serve in the position of Regional Director, and in 2022 all three of the other Regional Directors were persons of color.

13.    Mr. Paul Monteiro, who had previously served as CRS' Acting Director from March,

2016 to January, 2017, returned to CRS in May, 2022 as the Senate-confirmed Director of CRS.

14.     Upon his return, Mr. Monteiro reinitiated his discriminatory, illegal conduct designed to remove Ms. Gorecki from CRS.[1]

15.     Beginning in May 2022, and continuing until his departure from DOJ in April 2023, Mr. Monteiro filled leadership positions, particularly those of Regional Directors, with only African Americans.

16.     Mr. Monteiro also placed men of color in "temporary" positions (without competition) which far exceeded the permissible time for a temporary promotion.

17.     For example, Mr. Monteiro placed men of color who were GS-14s into temporary GS-15 positions and allowed them to stay in these higher positions past the time limit for a temporary reassignment.  This procedure allowed these men of color to accrue GS-15 time in grade.

18.     These men of color did not have to compete for these temporary higher-grade promotions, and Mr. Monteiro never allowed qualified women at the GS-14 rank to apply or even to be considered for these temporary promotions.

19.     Mr. Monteiro promoted Justin Lock, an Asian/Latino male who, at the time was

---

[1]     Before his departure in January 2017 when he was still CRS' acting director, Mr. Monteiro improperly removed Ms. Gorecki as Regional Director and assigned her to serve as the CRS program and resource development coordinator, a position that never existed before at CRS. He placed a GS-14, African American male, Ken Bergeron in Ms. Gorecki's Regional Director position. Mr. Monteiro then attempted to illegally extend Ms. Gorecki's detail and to assign her as a Muslim and Sikh subject matter expert. Ms. Gorecki was neither Muslim, nor Sikh, and there were Muslims and Sikhs on staff at CRS.  The Office of Special Counsel intervened and Ms. Gorecki was restored to her Regional Director position in September 2016. Mr. Monteiro then retaliated and discriminated against Ms. Gorecki for his remaining four months at CRS.

Complaint
Page 6

approximately forty-one years old, from GS-13 to GS-14 to GS-15 without having to compete for these higher grades. Initially, Mr. Monteiro assigned Mr. Lock, a GS-13, to a Senior Staff Attorney position. Then, because Mr. Lock was not a licensed attorney, Mr. Monteiro assigned him as a Senior Advisor to the Director. Subsequently, Mr. Monteiro promoted Mr. Lock to a Chief of Staff position, which was at the GS-15 grade, without posting the job opportunity or having Mr. Lock compete for the position.

20.    No female, including Ms. Gorecki, was permitted to compete for the Chief of Staff position. Ms. Gorecki was clearly more qualified for the Chief of Staff position based upon her twelve years as a Regional Director, twelve years as a federal supervisor for CRS, and thirty-one years as a practicing attorney. Mr. Lock lacked any of these qualifications. Of course, Ms. Gorecki could not apply for the position because Mr. Monteiro did not post this position, instead simply announcing Mr. Lock's appointment.

21.    Mr. Monteiro removed all Caucasian women from leadership at the agency (or failed to reinstate them) when he returned as the CRS director in May 2022. By December 2022, seven months after Mr. Monteiro returned to CRS, no white woman served in a leadership capacity at CRS (Mary Gorecki, Theresa Segovia, and Gerri Ratliff). Ms. Gorecki's Regional Director position was given to three African Americans. Ms. Segovia's Associate Director position was given to an African American, and Ms. Ratliff's Deputy Director position was given to an African American.

22.    When Mr. Monteiro returned to CRS, he announced that he would meet "one on one" with all employees. Mr. Monteiro met with all of Ms. Gorecki's direct reports, and all other CRS employees. He did not meet with Ms. Gorecki.

23.    In fact, in the ten months as CRS' Director, Mr. Monteiro did not speak to Ms. Gorecki directly and failed to acknowledge her presence in meetings (virtually or in person).

24.    When Mr. Monteiro first returned to CRS, he made no effort to hide the fact that he intended to remove Ms. Gorecki as Regional Director.  To perpetuate this discriminatory conduct, he ordered Deputy Director Gerri Ratliff ("Ms. Ratliff") to conduct an internal search for cases where Ms. Gorecki produced the most casework for CRS.

25.    The search revealed that Ms. Gorecki was the highest performing Regional Director and generated more casework than all other Regional Directors.  Furthermore, the other Regional Directors had never done an environmental justice ("EJ") case or a disability case.  By default, Ms. Gorecki was deemed the expert in both areas because the data search showed that she was the only Regional Director that had done this work at all.

26.    However, a search on any jurisdiction (race, religion, administration of justice, national origin, etc.) would have also yielded the same results—Ms. Gorecki had the most cases in those areas and, by Mr. Monteiro's logic, was therefore the most qualified in every jurisdiction area. Mr. Monteiro created a pretext like he had done in 2016 when he previously removed Ms. Gorecki from her position as regional director. The pretext was that these positions were CRS' priorities and of a critical need.

27.    Before Mr. Monteiro created the environmental justice and disabilities "agency priorities," the Regional Directors discussed all initiatives and agreed that it would be best to have subject matter experts ("SME") to consult with about their area of expertise.

28.    As an agency, CRS leadership voted on agency priorities annually (2019, 2020, 2021, and 2022) and never once did environmental justice or disability ever make the top ten priorities,

let alone the agency's first or second priority. The voted-on priorities during those years were always race, gender identity, and sexual orientation.

29.    Subsequently, Mr. Monteiro created this alleged, new position of Disability and Environmental Justice SME specifically as part of his plan to remove Ms. Gorecki, and claimed that this new position was critical.

30.    It was customary and best practice at CRS for high priority positions such as the alleged EJ/Disability SME to be posted on usajobs.gov to solicit applicants from the largest pool of qualified candidates possible.

31.    Contrary to Mr. Monteiro's claims that the Program Manager position was an Agency priority, he had Ms. Ratliff announce the newly created EJ/Disability SME position internally to CRS via email.  The position was not posted on usajobs.gov; and therefore, CRS did not have access to the largest pool of candidates who were qualified in the areas of environmental justice and disabilities.

32.    Ms. Gorecki was not an individual with disabilities and did not have any degrees, education, or qualifications in the areas of environmental justice or disabilities. Like the Muslim and Sikh position Mr. Monteiro tried to place Ms. Gorecki in, there were qualified individuals on staff at CRS with disabilities.

33.    Had the position been competitively filled via usajobs.gov, Ms. Gorecki would not have qualified for the role based on educational requirements.

34.    After none of the existing CRS GS-15 staff requested to become the subject matter expert for EJ and Disability, on August 15, 2022, Mr. Monteiro permanently removed Ms. Gorecki from her position as Regional Director of Regions I, V, and VII, and placed her in the

position of Program Manager for Environmental Justice and Disabilities.

35.    Mr. Monteiro stripped Ms. Gorecki of her supervisory duties, removed all support for Ms. Gorecki, eliminated her from leadership meetings, issued a new SF-50, placed her in a different job series, and removed her as the lead for working groups and committees.

36.    Synthia Taylor ("Ms. Taylor"), an African American and the Regional Director from Dallas was appointed to replace Ms. Gorecki as the Acting Regional Director for Regions V and VII.

37.    Matthew Lattimer, an African American male, was initially appointed the new Acting Regional Director for Region I to replace Ms. Gorecki.  Subsequently, Darryck Dean, another African American male, became the Acting Regional Director for Region I.

38.    Ms. Gorecki was eminently more qualified than Ms. Taylor, Mr. Lattimer, or Mr. Dean to serve as Regional Director.  Ms. Gorecki was the only one to have served for twelve years as a Regional Director, and Mr. Lattimer and Mr. Dean had never served as Regional Directors.  Ms. Taylor did not have a law degree and served only approximately six years as Regional Director.  In addition, Ms. Gorecki led more deployments than the three individuals collectively, handled many more high-profile hate crimes, and led many more working groups for the agency.

39.    When Ms. Taylor took over Ms. Gorecki's Regions on August 15, 2022, she immediately started harassing and humiliating Ms. Gorecki.

40.    Ms. Taylor was instructed to assign Ms. Gorecki remedial tasks at the Chicago Office when Ms. Taylor took over Ms. Gorecki's position in August, 2022.

41.    Ms. Taylor ordered Ms. Gorecki around like a secretary or a conciliation specialist.

42.   Ms. Taylor made administrative demands of Ms. Gorecki which were at a GS-4 grade level (not at a GS-15 grade level). Ms. Taylor order Ms. Gorecki to update reports on the General Services Administration ("GSA") vehicles in the Regions, provide maintenance updates on the phones, and maintain the services for the cable television.  Ms. Gorecki had to report on the Xerox machines and the number of copies made monthly.  Additionally, Ms. Taylor tasked Ms. Gorecki with a variety of even more menial tasks unrelated to the Program Manager position, including calling the GSA to make sure the office was vacuumed and cleaned; packing and unpacking  boxes; and shipping packages to Washington, D.C.

43.   Ms. Taylor ordered Ms. Gorecki to perform records management work such as cleaning and shredding, and data entry. Ms. Gorecki also absorbed the duties of her former Administrative Assistant, Melissa Simmons ("Ms. Simmons"), which included answering the telephones and the front door.  None of these tasks had anything to do with the artificially-created position of EJ and Disability program manager. They were demeaning, demoralizing and well below Ms. Gorecki's GS-15 pay grade.

44.   While Ms. Gorecki was in the fake program manager position, Mr. Montero routinely excluded Ms. Gorecki from environmental justice leadership meetings at DOJ and no one at CRS opened a single disability case based upon Ms. Gorecki's referrals during the first four months of her being in this artificial program manager position.

45.   When Mr. Monteiro attended 2022's last DOJ EJ meeting, he refused to allow Ms. Gorecki to accompany him despite her being the alleged program manager for environmental justice.  While in the meeting, Mr. Monteiro urgently emailed Ms. Ratliff asking for a report of the EJ work from August – December 2022 because he had no knowledge of any work Ms.

Gorecki had done in this high-priority, critical position he created.

46.    This was the first and only time Mr. Monteiro took an active interest in what he had previously deemed a critical, high priority need for CRS.

47.    Conversely, the true critical role was and is the Regional Director position for Regions I and V (Boston and Chicago) where Ms. Gorecki served for 12 ½ years.

48.    This role was so critical for CRS that Mr. Monteiro posted the position in USAJOBS.gov on September 1, 2022 (within fifteen days of Ms. Gorecki's removal as Regional Director).

49.    Two of the largest cases nationwide happened in Region V weeks after Ms. Gorecki's removal, which required the entire agency to support, except for Ms. Gorecki, who was not asked to participate in her former region in any way.

50.    On September 1, 2022, when the position of Regional Director for Regions I and V went live on USAJOBS.gov, Ms. Gorecki, recognizing the importance of the Regional Director position and her obviously being the most well-qualified applicant, asked Ms. Ratliff to remove the job announcement and to reinstate her to her former position as Regional Director for regions I and V.

51.    Mr. Monteiro told Ms. Ratliff that Ms. Gorecki would never be a Regional Director at CRS ever again and that he would not withdraw the job announcement posting.

52.    On September 9, 2022, Ms. Gorecki's request to be reinstated to her former position as Regional Director for Regions I and V was denied by Mr. Monteiro.

53.    Because Mr. Monteiro refused to take down the job announcement and reinstate Ms. Gorecki, Ms. Gorecki then applied in USAJOBS.gov for her former position as Regional

Director for Regions I and V.

54.    The job announcement for the position of Regional Director closed on September 14, 2022, and Ms. Gorecki made the cert list for the position.

55.    On September 27, 2022, Ms. Gorecki contacted the DOJ, Justice Management Division ("JMD"), Equal Employment Opportunity Staff ("EEOS") to commence the informal EEO process, citing race, gender, and age discrimination along with retaliation by CRS.

56.    On November 8, 2022, Ms. Gorecki was granted an interview for her former position of Regional Director. The interview was conducted by Ms. Ratliff, Ms. Taylor, and Antoinette Barksdale ("Ms. Barksdale").

57.    That same day, Ms. Taylor (who was not Ms. Gorecki's supervisor at the time) falsely accused Ms. Gorecki of not reporting to the office and not requiring the administrative assistant, Ms. Simmons to report to the office twice a week, as required by their telework policy.

58.    Ms. Taylor went so far as to tell Ms. Simmons that Ms. Gorecki probably allowed this, and that Ms. Gorecki didn't go to the office either. Ms. Taylor accused the two women of conspiring together to not report to the office on their regular in-office days.

59.    Ms. Gorecki and Ms. Simmons did not violate any policy and advised Ms. Taylor that her allegations were false, and there certainly was no conspiracy or violation ever.

60.    Ms. Simmons informed Ms. Taylor on November 8, 2022 during the same conversation with Ms. Taylor  that Ms. Simmons was quitting effective immediately, and that Ms. Simmons had never been subjected to such harassment in her entire professional career.

61.    Within hours of Ms. Taylor's false accusations, Ms. Taylor sabotaged Ms. Gorecki's interview to obtain her Regional Director position.  Ms. Taylor was smirking and asking Ms.

Complaint
Page 13

Gorecki assigned questions about values and qualities like integrity on the same day Ms. Taylor falsely accused Ms. Simmons and Ms. Gorecki of violating policy.

62.     After Ms. Gorecki's interview, despite the sabotage, she learned that she was the highest-scoring candidate in the interview process and the written exercise.

63.     Ms. Ratleff informed Mt. Monteiro that Ms. Gorecki was the highest-scoring applicant.  Mr. Monteiro advised Ms. Ratliff that Ms. Gorecki would never be a Regional Director at CRS again and informed Ms. Ratliff to throw out the cert list.

64.     Ms. Ratliff ordered that the cert list be returned with no selection on December 30, 2022, and on that same day, Ms. Ratliff resigned her position as CRS' Deputy Director and ended her federal career.

65.     Ms. Gorecki's non-selection was humiliating given the fact that she had been a Regional Director for twelve years, a Regional Director vacancy was posted, and Mr. Monteiro refused, despite Ms. Gorecki being the most qualified for the position, to appoint her.

66.     Upon Ms. Ratliff's departure from CRS, Mr. Monteiro appointed two African-American females without any competition to the two senior leadership roles at CRS.  Ms. Barksdale was appointed Acting Deputy Director and Ms. Taylor was appointed CRS's Associate Director.

67.     At this moment in time, CRS' leadership contained no Caucasians and consisted completely of African Americans. Ms. Gorecki was not invited to apply for the temporary promotions to Associate Director or Deputy Director despite being more qualified that Ms. Barksdale and Ms. Taylor for the positions.

68.     After receiving a notice of right to file a formal complaint with JMD EEO, in

December 2022, Ms. Gorecki moved forward with a formal complaint.

69.    As soon as Paul Monteiro learned that he and Ms. Taylor had been named in Ms. Gorecki's formal EEO complaint, he assigned Ms. Taylor to be Ms. Gorecki's first-line supervisor.

70.    Beginning on or about January 3, 2023, and continuing to June 2, 2023, the date Ms. Gorecki was constructively discharged from CRS , Ms. Taylor bombarded Ms. Gorecki with work at all hours of the night.  On January 9, 2023, Ms. Taylor issued a memorandum to Ms. Gorecki requiring national disability convenings be held across the country. This added hundreds of hours of work and requirements that were not in Ms. Gorecki's Performance Work Plan for the fake program manager position.

71.    Ms. Taylor would email Ms. Gorecki late at night, and Ms. Gorecki did not check her email after hours.  Nevertheless, Ms. Taylor would admonish Ms. Gorecki for not responding. The emails and messages were exceptionally abrupt and rude and often identified tasks that had to be completed on very short notice. This included weekend messages with deadlines  on Monday mornings.

72.    For example, in one message, Ms. Taylor informed Ms. Gorecki on a Sunday that Ms. Gorecki needed to travel to Madison, Wisconsin to do conciliation work for a conciliator who had covid.  This work was unrelated to the fake program manager position.

73.    Likewise, Ms. Taylor ordered Ms. Gorecki to travel to Atlanta regarding the shooting of an individual protesting the construction of a police academy in order to preserve trees. This case was not an environmental justice case and completely unrelated to the fake program manager position. Ms. Gorecki was forced to travel from Chicago to Atlanta, only to have Ms.

Taylor advise Ms. Gorecki that the United States Attorney told CRS to leave the district and to not conduct any work, because it was a criminal matter, not an EJ case.

74.    In late March 2023, Mr. Monteiro, Ms. Barksdale, Ms. Taylor and Mr. Lock, ordered Ms. Gorecki to hold an in-person meeting with the disability community in California.  CRS provided no support, no accessible space for the convening, or accessible parking for the participants.  In addition, CRS ordered that no individuals with disabilities could attend virtually; they must attend in person.

75.    On the morning of the first day of the disability meeting, Ms. Taylor, Ms. Barksdale and Mr. Lock directed Ms. Gorecki to send them a Teams link to join the in-person meeting virtually. Ms. Gorecki was unaware she had to arrange for a link to the meeting until the night before the convening when Ms. Taylor informed her that one had to be set up so that she (Ms. Taylor), Ms. Barksdale, and Mr. Lock could join. Ms. Gorecki did not understand why the entire meeting could not be held virtually given the audience and their various disabilities.

76.    When Mr. Lock joined the meeting, he had his camera and microphone off and did not interact with anyone. Ms. Taylor said hello to the group when she joined, but otherwise had her camera and microphone off. Ms. Barksdale did the same. Each was only in the meeting for a few minutes before logging off.

77.    Ms. Taylor, Ms. Barksdale, and Mr. Lock logged on to the disability meeting  only to ensure that Ms. Gorecki was holding the meeting in person.   Ms. Taylor, Ms. Barksdale, and Mr. Lock did not participate substantively in the meeting, and the fact they signed on for such a brief moment was extremely humiliating to Ms. Gorecki.

78.    On January 3, 2023, after Ms. Ratliff left CRS, Ms. Gorecki sent a formal written

Complaint
Page 16

request to Mr. Montiero and Ms. Taylor requesting that she be reinstated to her position of Regional Director.  Ms. Taylor and Mr. Monteiro rejected the request.   From the moment Mr. Monteiro reassigned Ms. Gorecki from her Regional Director Position to the artificial program manager position, Ms. Ratliff consistently told Ms. Gorecki that she would remain in her fake position as  program manager. Then when Ms. Ratliff was gone, Ms. Taylor repeatedly indicated that Ms. Gorecki would never be returned to her position of regional director.

79.    By remaining in the fake program manager position and not being reinstated to her regional director position, Ms. Gorecki was unable to receive awards and lacked any supervisory responsibilities whatsoever.  Ms. Gorecki was never restored  to her position as Regional Director.

80.    On March 15, 2023, Ms. Taylor, despite no evidence to support her November 8, 2022 false allegation of not reporting to the office in accordance with the telework policy and telework agreement, issued Ms. Gorecki a Letter of Reprimand ("LOR").  The information in the LOR was false and immediately rebutted with affidavits and telework records. When Ms. Gorecki accused Ms. Taylor of retaliation, Ms. Taylor indicated she was merely doing what she had been told to do.

81.    On March 29, 2023, Ms. Gorecki filed an administrative grievance of the LOR. Ms. Barksdale, Acting Deputy Director and General Counsel, acted as the grievance official even though Ms. Gorecki immediately informed Ms. Taylor that Ms. Barksdale could not serve simultaneously as General Counsel, the acting Deputy Director, Ms. Gorecki's second line supervisor, and as the grievance official.

82.    Ms. Barksdale did not acknowledge or respond to the administrative grievance,

despite there being time limits for a response.  Ms. Barksdale ignored the time limits and the

grievance and never responded in order to harass and abuse Ms. Gorecki and retaliate against her

for her EEO activity .

83.    Mr. Monteiro resigned as CRS' Director on April 3, 2023.  Mr. Lock was appointed

CRS' Acting Director.  Before he departed, Mr. Monteiro hired three African-Americans

conciliators for Region V and an African American Regional Director for Region VII.  These

regions were formerly Ms. Gorecki's regions and were now fully staffed only by African-

Americans.

84.    At the all-staff conference in Chicago from April 19-21, 2023, the new Acting CRS

Director, Mr. Lock commented that none of the conference guests and community stakeholders

knew about CRS and did not know Ms. Gorecki despite her serving as Regional Director in

Chicago for twelve years.  Mr. Lock's statements were false, harassing Ms. Gorecki, and

humiliating to her.

85.    From January 2023 continuing to June 2, 2023, Ms. Barksdale also sent Ms. Gorecki

harassing emails stating that she did not like the tone of Ms. Gorecki's emails and that she

violated CRS's Culture of Respect and Excellence ("CORE") principles. Ms. Barksdale made it

very clear that Ms. Gorecki did not fit in with CRS' culture.

86.    For example, Ms. Gorecki responded to an email regarding Native Americans in

Wisconsin and indicated the matter was focused on civil matters, not environmental justice

matters. Ms. Gorecki's response disagreed with Mr. Lock, Ms. Taylor's assessment  of the

matter, and Ms. Barksdale emailed Ms. Gorecki indicating that Ms. Gorecki 's email's tone

violated CORE principles.

87.    On May 2, 2023, Mr. Lock directed Ms. Gorecki to hold another disability convening in Texas; Ms. Taylor informed her that this next meeting would be held in person, and again, there would be no virtual option for the individuals with disabilities.

88.    Ms. Gorecki began to plan the meeting in early May, and then went on annual leave on May 5, 2023.

89.    Because she could not take the constant abuse and harassment including, but not limited to, being reassigned to a fake position, the stripping of all supervisory responsibilities, ordered to do menial tasks, tripling her workload with irrelevant and non-jurisdictional work, never speaking to CRS' director, false allegations of misconduct levied against her, replaced in her former position as Regional Director with less qualified candidates, and not appointed to her former position even though she was the most qualified, Ms. Gorecki was constructively discharged and resigned on May 15, 2023.

90.    CSR continued its discriminatory tactics even after Ms. Gorecki's constructive discharge.  Even though Ms. Gorecki was constructively discharged, CRS never withdrew the LOR, despite Ms. Barksdale never responding to Ms. Gorecki's grievance contesting the LOR.

91.    During the last two weeks of Ms. Gorecki's employment, Ms. Taylor, Ms. Barksdale, and Mr. Lock did not request any summaries of her work as the Program Manager for EJ and Disabilities; and in June 2023, after Ms. Gorecki had resigned, she learned that Ms. Barksdale, Ms. Taylor, and Mr. Lock announced that no one would be assigned to Ms. Gorecki's disability work, and that CRS would not be posting a vacancy announcement for a SME Program Manager for EJ or Disability in the future, despite CRS management telling Ms. Gorecki that she was placed in the position because it was a critical need for the agency.

92.    The supposed National Program Manager position was not filled internally once Ms. Gorecki resigned, and was never posted on USAJOBS.gov.

93.    The SME Program Manger position was a fake position designed to remove Ms. Gorecki as Regional Director, to harass her, and to conceal the true illegal, discriminatory motives behind Ms. Gorecki's illegal reassignment from Regional Director to program manager. Ms. Gorecki never received a mid-year performance review from her supervisor, Ms. Taylor, nor did Ms. Gorecki receive a final performance review in June 2023 from Ms. Taylor. Ms. Gorecki was not asked to conduct an exit interview, nor was she asked for any records of her work as the Program Manager.

94.    The critical position was Ms. Gorecki's former position as Regional Director for Regions I and V as again established by the fact that CRS immediately posted Ms. Gorecki's regional director position on USAJOBS.gov when Ms. Gorecki was constructively discharged in June, 2023.

95.    CRS appointed Kenneth Bergeron, an African American male who used to be a conciliator in Region V under Ms. Gorecki's supervision.  Ms. Gorecki was more qualified than Mr. Bergeron, and had been selected in 2010 over Mr. Bergeron as the Regional Director for Region V.

96.    From the time Mr. Monteiro rejoined CRS in May, 2022 until he departed in April, 2023, he consistently made remarks about older staff members.

97.    For example, in October 2022 in Washington D.C., He stated to the entire staff including Ms. Gorecki "I won't have the old staff poisoning the new staff. When they come in, young, fresh, and enthusiastic, it will be up to them whether they want to hate the agency."

Complaint
Page 20

98.    At that same conference, Mr. Monteiro invited a youth advocate to speak to the entire agency.  Mr. Monteiro made it a point to tell the staff that the speaker was in his twenties and therefore could relate to the community and actual activists better than the staff.  He, the twenty-something year old, could relate to the people on the ground because he was the same age and same race.

99.    Mr. Monteiro also made racial remarks.  He told Ms. Ratliff not to hire any Caucasian Presidential Management Fellows, a program designed to bring young people into the federal government, because those positions were reserved for youth of color.  In 2023, Mr. Monteiro informed Ms. Ratliff to tell the female Caucasian Presidential Management Fellows working at CRS, that they would not be converted to permanent federal employees at the end of the program.

### COUNT I
**(Constructive Discharge Based Upon Race In Violation
of Title VII, 42 U.S.C. §2000e-16)**

100.  Paragraphs 1-99 are realleged and reincorporated herein by reference

101.  CRS' illegal reassignment of Ms. Gorecki from Regional Director to program manager stripped Ms. Gorecki of her supervisory responsibilities and the responsibilities she possessed while a Regional Director.

102.  The illegal reassignment constituted intentional discrimination based upon her race.

103.    The combination of the illegal reassignment and the constant illegal and improper harassment abuse by Mr. Monteiro and his cohorts towards Ms. Gorecki based upon her race created intolerable and insufferable working conditions for Ms. Gorecki.  Therefore, she resigned her position from CRS.

104.  Any purported justifications for Ms. Gorecki's reassignment and constant harassment by Mr. Monteiro and his associates were pretextual, designed to conceal the true racial discriminatory reason underlying the reassignment and harassment.

105.  As a direct cause of Defendant's discriminatory acts, Ms. Gorecki suffered and continues to suffer economic damages, emotional distress, and humiliation.

106.  Defendant's discriminatory acts and intentions were malicious, and in willful, wanton or reckless disregard of Ms. Gorecki's rights.

### COUNT II
**(Constructive Discharge Based Upon Gender In Violation
of Title VII, 42 U.S.C. §2000e-16)**

107.  Paragraphs 1-106 are realleged and reincorporated herein by reference

108.  CRS' illegal reassignment of Ms. Gorecki from Regional Director to program manager stripped Ms. Gorecki of her supervisory responsibilities and the responsibilities she possessed while a Regional Director.

109.  The illegal reassignment constituted intentional discrimination based upon her gender and made Ms. Gorecki's working conditions intolerable.

110.   The combination of the illegal reassignment and the constant illegal and improper harassment by Mr. Monteiro and his cohorts towards Ms. Gorecki based upon her gender created intolerable and insufferable working conditions for Ms. Gorecki .  Therefore, she resigned her position from CRS.

111.  Any purported justifications for Ms. Gorecki's reassignment and constant harassment by Mr. Monteiro and his associates based upon Ms. Gorecki's gender was pretextual, designed to

conceal the true gender discrimination reason underlying Ms. Gorecki's illegal and improper reassignment and harassment.

112.  As a direct cause of Defendant's discriminatory acts, Ms. Gorecki suffered and continues to suffer economic damages, emotional distress, and humiliation.

113.  Defendant's discriminatory acts and intentions were malicious, and in willful, wanton or reckless disregard of Ms. Gorecki's rights.

## COUNT III
### (Discriminatory Reassignment Based Upon Race in Violation of Title VII, 42 U.S.C. §2000e-16)

114.  Paragraphs 1-113 are realleged and reincorporated by reference.

115.  135.CRS' illegal reassignment of Ms. Gorecki from Regional Director to program manager stripped Ms. Gorecki of her supervisory responsibilities and the responsibilities she possessed while a Regional Director.

116.  The illegal reassignment constituted intentional discrimination based upon her race.

117.  Any purported justifications for Ms. Gorecki's reassignment and constant harassment by Mr. Monteiro and his associates based upon Ms. Gorecki's race was pretextual, designed to conceal the true racial discriminatory reason underlying the reassignment and harassment.

118.  As a direct cause of Defendant's discriminatory acts, Ms. Gorecki suffered and continues to suffer economic damages, emotional distress, and humiliation.

119.  Defendant's discriminatory acts and intentions were malicious, and in willful, wanton or reckless disregard of Ms. Gorecki's rights.

**COUNT IV**
**(Discriminatory Reassignment Based Upon Gender in Violation**
**of Title VII, 42 U.S.C. §2000e-16)**

120.   Paragraphs 1-119 are realleged and reincorporated by reference.

121.   CRS' illegal reassignment of Ms. Gorecki from Regional Director to program manager stripped Ms. Gorecki of her supervisory responsibilities and the responsibilities she possessed while a Regional Director.

122.   The illegal reassignment constituted intentional discrimination based upon her gender.

123.   Any purported justifications for Ms. Gorecki's reassignment and constant harassment by Mr. Monteiro and his associates based upon Ms. Gorecki's gender was pretextual, designed to conceal the true discriminatory reason based upon Ms. Gorecki's gender underlying the illegal reassignment.

124.   As a direct cause of Defendant's discriminatory acts, Ms. Gorecki suffered and continues to suffer economic damages, emotional distress, and humiliation.

125.   Defendant's discriminatory acts and intentions were malicious, and in willful, wanton or reckless disregard of Ms. Gorecki's rights.

**COUNT V**
**(Hostile Work Environment In Violation of Title VII,**
**42 U.S.C. § 200e-16)**

126.   Counts 1-125 are realleged and reincorporated herein

127.   The constant harassment by Mr. Monteiro and his associates including, but not limited to, her illegal reassignment and assigning her menial tasks, based upon Ms. Gorecki's race and gender created  a working environment that altered Ms. Gorecki's working environment

and created an abusive working environment.

128.   The harassment and the abuse targeted towards Ms. Gorecki was constant, severe.

and pervasive.

129.   As a direct cause of Defendant's hostile work environment, Ms. Gorecki suffered and

continues to suffer economic damages, emotional distress, and humiliation.

130.   Defendant's hostile work environment was malicious, and in willful, wanton or

reckless disregard of Ms. Gorecki's rights.

## COUNT VI
### (Constructive Discharge Based Upon Age in Violation
of the Age Discrimination in Employment Act, 29 U.S.C. § 623)

132.     Paragraphs 1- 131 are realleged and reincorporated herein by reference.

133.     Defendant's constructive discharge of Ms. Gorecki was improperly based upon

her age, 57.

134.      Ms. Gorecki's age played a role in the Defendant's decision to terminate her and

had a determinative effect on the improper decision.

135.     Any purported justification for Ms. Gorecki's illegal and improper termination

was pretextual, designed to conceal the true discriminatory motive underlying her illegal and

improper termination.

## COUNT VII
### (Reassignment Based Upon Age in Violation
of the Age Discrimination in Employment Act, 29 U.S.C. § 623)

136.     Paragraphs 1-135 are realleged and reincorporated herein by reference.

137.     Defendant's reassignment of Ms. Gorecki in 2022 was improperly based upon her

age, 57.

Complaint
Page 25

138.    Ms. Gorecki's age played a role in the Defendant's decision to reassign her and had a determinative effect on the improper decision.

139.    Any purported justification for Ms. Gorecki's illegal and improper reassignment was pretextual, designed to conceal the true discriminatory motive underlying her illegal and improper termination.

## COUNT VIII
### (Retaliation In Violation of 42 U.S.C. § 2000e-3(a))

140.    Paragraphs 1-139 are realleged and reincorporated herein

141.    Ms. Gorecki engaged in protected activity by filing her informal EEO complaint in September, 2022 after her illegal and improper reassignment.

142.    Ms. Gorecki then notified Mr. Monteiro and Ms. Ratliff that she had filed the EEO complaint regarding her reassignment on September 28, 2022.

143.    Less than thirty days later, the Defendant began a baseless investigation into alleged misconduct by Ms. Gorecki regarding her timekeeping and other misconduct.

144.    CRS also began to harass and abuse Ms. Gorecki including, but not limited to, assigning her tasks unrelated to her fake program manager job, issuing the LOR, not responding to Ms. Gorecki's grievance contesting the LOR, tripling her workload with irrelevant and non-jurisdictional work, never speaking to CRS' director, alleging false allegations against her, and creating a hostile work environment.

145.    These efforts were designed by CRS to dissuade Ms. Gorecki from supporting her charges of discrimination contained in her EEO complaint.

146.    A causal connection connected Ms. Gorecki's protected activity and CRS's illegal

and improper retaliatory actions.

## COUNT IX
### (Retaliation Based Upon Age in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d))

147.    Paragraphs 1-146 are realleged and reincorporated herein

148.    Ms. Gorecki engaged in protected activity by filing her informal EEO complaint alleging race, gender, and age discrimination in September 2022.

149.    Ms. Gorecki then notified Mr. Monteiro and Ms. Ratliff that she had filed the EEO complaint on September 28, 2022.

150.    Less than thirty days later, the Defendant began a baseless investigation into alleged misconduct by Ms. Gorecki regarding her timekeeping and other misconduct.

151.    CRS also began to harass and abuse Ms. Gorecki including, but not limited to, assigning her tasks unrelated to her fake program manager job, issuing the LOR, not responding to Ms. Gorecki's grievance contesting the LOR, tripling her workload with irrelevant and non-jurisdictional work, never speaking to CRS' director, alleging false allegations against her, and creating a hostile work environment.

152.    These efforts were designed by CRS to dissuade Ms. Gorecki from supporting her charges of discrimination contained in her EEO complaint.

**WHEREFORE**, Plaintiff, Mary Gorecki, prays for the following relief:

a) **As to Count I:**

i.    Reinstatement to her position as Regional Director;
ii.   Compensatory damages in an amount to be determined;
iii.  Reasonable Attorney Fees and Costs; and
iv.   Any and all other relief this Court deems just and equitable.

b) **As to Count II:**

i.    Reinstatement to her position as Regional Director;
ii.   Compensatory damages in an amount to be determined;
iii.  Reasonable Attorney Fees and Costs; and
iv.   Any and all other relief this Court deems just and equitable.

c) **As to Count III:**

i.    Reinstatement to her position as Regional Director;
ii.   Compensatory damages in an amount to be determined;
iii.  Reasonable attorney fees and costs; and
iv.   Any and all other relief this Court deems just and equitable

d) **As to Count IV:**

i.    Reinstatement to her position as Regional Director;
ii.   Compensatory damages in an amount to be determined;
iii.  Reasonable attorney fees and costs; and
iv.   Any and all other relief this Court deems just and equitable.

e) **As to Count V:**

i.    Reinstatement to her position as Regional Director;
ii.   Compensatory damages in an amount to be determined;
iii.  Reasonable attorney fees and costs; and
iv.   Any and all other relief this Court deems just and equitable

Complaint
Page 28

**As to Count VI:**

i.      Reinstatement to her position as Regional Director;
ii.     Backpay plus interest;
iii.    Reasonable attorney fees and costs; and
iv.     Any and all other relief this Court deems just and equitable, including liquidating damages.

**As to Count VII:**

i.      Reinstatement to her position as Regional Director;
ii.     Backpay plus interest;
iii.    Reasonable attorney fees and costs; and
iv.     Any and all other relief this Court deems just and equitable, including liquidated damages.

**As to Count VIII:**

i.      Reinstatement to her position as Regional Director;
ii.     Compensatory damages in an amount to be determined;
iii.    Reasonable attorney fees and costs; and
iv.     Any and all other relief this Court deems just and equitable.

**As to Count IX:**

i.      Reinstatement to her position as Regional Director;
ii.     Backpay plus interest;
iii.    Reasonable attorney fees and costs; and
iv.     Any and all other relief this Court deems just and equitable, including liquidated damages.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a jury trial of all issues so triable.

Respectfully submitted this 8th day of November, 2024.

LAW OFFICE OF ROSS A. NABATOFF

By:     /s/Ross A. Nabatoff
        Ross A. Nabatoff, DC Bar # 376665
        2001 L Street, N.W.
        Washington, D.C.  20036-4955
        (202) 650-0037
        *Attorney for Plaintiff*
        *Mary E. Gorecki*