**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARY GORECKI, | |
| *Plaintiff*, | |
| v. | Civil Action No. 24-3168 (RDM) |
| PAMELA J. BONDI, | |
| *Defendant.* | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Mary Gorecki brings this action against her former employer, the United States

Department of Justice ("DOJ"), alleging discrimination on the basis of race, gender, and age, and

retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act, 42

U.S.C. § 2000e *et seq*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

§ 621 *et seq.*[1]  Gorecki alleges that the DOJ unlawfully transferred her from her position as a

Regional Director in the DOJ Community Relations Service ("CRS"), subjected her to continued

harassment in her new position, retaliated against her when she objected to her treatment, and

constructively discharged her from the department entirely.  *See generally* Dkt. 13-2 (Am.

Compl.).  Defendant has now filed a partial motion to dismiss, *see* Dkt. 18, seeking to dismiss

Plaintiff's claims for age-based discriminatory reassignment, hostile work environment,

constructive discharge, and retaliation.

For the reasons that follow, the Court will **GRANT** in part and **DENY** in part

Defendant's partial motion to dismiss.

---

[1] Plaintiff brought this action against the U.S. Attorney General in his official capacity.  The
current holder of the office was automatically substituted as defendant under Rule 25(d).

## I. BACKGROUND

The following factual allegations are taken from Plaintiff's amended, operative complaint, Dkt. 13-2 (Am. Compl.), which the Court accepts as true for the purpose of resolving the pending motion to dismiss. *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 163–64 (D.C. Cir. 2015).

Plaintiff Mary Gorecki, a white, 57-year-old woman, began working at the CRS in March 2010. Dkt. 13-2 at 4 (Am. Compl. ¶ 1). The CRS "works with community groups to resolve community conflicts based upon race, color, and national origin and to prevent and to respond to alleged hate crimes arising from differences of race, color, national origin, gender, gender identity, sexual orientation, religion, or disability." *Id.* (Am. Compl. ¶ 2). Within the CRS, Gorecki worked as a "Regional Director" with responsibility for several geographic areas—Regions I, V, and VII—and also occasionally served as the Acting Associate Director and Acting Deputy Director. *Id.* at 5, 10 (Am. Compl. ¶¶ 8–9, 38). She was the only white woman to have ever held the position of a CRS Regional Director. *Id.* (Am. Compl. ¶ 12).

The present case results from Gorecki's conflict with Paul Monteiro, who was confirmed by the United States Senate as the Director of the CRS in May 2022. *Id.* at 5–6 (Am. Compl. ¶ 13). That appointment was not Monteiro's first experience with the CRS, or with Gorecki. Prior to his 2022 appointment, Monteiro had served as Acting Director of the CRS from March 2016 to January 2017 and, during that time, temporarily transferred Gorecki from her Regional Director post to a new job as the "CRS program and resource development coordinator." *Id.* at 5–6, 6 n.1 (Am. Compl. ¶¶ 13–14). The Office of Special Counsel restored Gorecki to her Regional Director position in September 2016, but Gorecki alleges, without further detail, that

Monteiro continued to "retaliate[] and discriminate[] against [her]" during the remainder of his 2016–17 tenure at the CRS.  *Id.* at 6 n.1 (Am. Compl. ¶ 14).

Upon his 2022 return to the CRS, Monteiro began placing men of color into temporary, high-ranking positions without requiring competition for those roles or considering qualified women candidates.  *Id.* at 6 (Am. Compl. ¶¶ 16–18).  That included promoting Justin Lock, an Asian/Latino male employee, from a GS-13 position to a GS-15 Chief of Staff role without posting the position or allowing Gorecki or any other female candidate to apply.  *Id.* at 6–7 (Am. Compl. ¶¶ 19–20).  Monteiro then began preparing to once again transfer Gorecki from her role as Regional Director, as part of a broader effort to remove all the white women holding leadership roles at the CRS and to replace them with African American employees.  *Id.* at 7–8 (Am. Compl. ¶¶ 21, 24).  To create a pretext for her transfer, Monteiro first asked CRS Deputy Director Gerri Ratliff to review Gorecki's work and identify areas where she had "produced the most casework for [the] CRS"—an exercise Gorecki portrays as pointless because, as the most senior and highest-performing Regional Director, she necessarily had more casework experience than her peers in any and all subject areas.  *Id.* at 8 (Am. Compl. ¶¶ 24–26).  Consistent with that theme, Ratliff's review determined that Gorecki was the only CRS Regional Director to have experience working on environmental justice or disability cases, *id.* (Am. Compl. ¶ 25), and in August 2022 Gorecki was transferred to a newly created position as a subject matter expert ("SME") for environmental justice and disability work with the job title of "Program Manager," *id.* at 8–10 (Am. Compl. ¶¶ 27, 31, 38).

Gorecki alleges that her transfer was marked by repeated, unexplained irregularities. First, Monteiro claimed that the new environmental justice and disabilities SME position was a critical priority for the CRS even though neither environmental justice nor disability had

previously been identified as a top CRS priority.  *Id.* at 8–9 (Am. Compl. ¶¶ 28, 31); *but see* Exec. Order No. 14008, § 222(c)(iii), 86 Fed. Reg. 7619, 7631 (Jan. 27, 2021); Exec. Order No. 14035, § 10, 86 Fed. Reg. 34593, 34599 (June 25, 2021).  CRS leadership had instead identified race, gender identity, and sexual orientation as the agency's top priorities, Dkt. 13-2 at 8–9 (Am. Compl. ¶ 28), but the CRS, including during Monteiro's tenure, never hired any SMEs for those areas, *id.* at 9 (Am. Compl. ¶¶ 30–32).  Moreover, the environmental justice and disability SME position was only announced internally, without being posted to USAJOBS.gov as would have been customary for a "high priority position[]."  *Id.* (Am. Compl. ¶¶ 33–35).  And after no CRS GS-15 asked to be placed in the position, Monteiro "permanently removed . . . Gorecki from her position as Regional Director of Regions I, V, and VII, and placed her in the position of Program Manager for Environmental Justice and Disabilities," *id.* at 10 (Am. Compl. ¶ 38), even though she lacked any particular background in environmental justice or disability work or the educational qualifications that were normally required for an SME role, *id.* (Am. Compl. ¶¶ 36–37).

As a result of the move, Gorecki was stripped of her supervisory duties, no longer attended leadership meetings, and was ordered to resign from a position on the Federal Executive Board.  *Id*. (Am. Compl. ¶ 39).  Gorecki's prior responsibilities were divided among several CRS employees.  Her role on the CRS three-member interview panel went to Antoinette Barksdale, an African American woman without comparable leadership experience.  *Id.* at 11 (Am. Compl. ¶ 40).  Her role as Regional Director for Region I went to Matthew Lattimer, a younger African American man, who was later succeeded by another African American man, Darryck Dean.  *Id.* (Am. Compl. ¶ 42).  Synthia Taylor, an African American woman, became Acting Regional Director for Regions V and VII.  *Id.* (Am. Compl. ¶ 41).  Gorecki alleges that she had far more

experience and relevant qualifications for the Regional Director role than Lattimer, Dean, or Taylor. *Id.* (Am. Compl. ¶ 43). Following the changes, Taylor began assigning Gorecki administrative tasks far below Gorecki's GS-level, including shredding, unpacking boxes, and filing reports about the office Xerox machines. *Id.* at 11–12 (Am. Compl. ¶¶ 45–48). Despite her supposed new responsibilities for environmental justice and disability work, Gorecki was also excluded from relevant leadership meetings of the DOJ environmental justice team and the department ignored her efforts to refer new disability cases to the CRS. *Id.* at 12–13 (Am. Compl. ¶¶ 49–51).

On September 1, 2022, shortly after Gorecki's transfer to her new role, the DOJ posted her old Regions I and V Regional Director position on USAJOBS.gov to find a permanent replacement. *Id.* at 13–14 (Am. Compl. ¶¶ 53–54, 56). Gorecki asked Ratliff to take down the posting and, instead, to reinstate Gorecki to the position, but Monteiro denied that request on September 9, 2022, telling Ratliff that "Gorecki would never be a Regional Director at [the] CRS ever again." *Id.* (Am. Compl. ¶¶ 56–58). A few weeks later, on September 27, 2022, Gorecki contacted the DOJ Equal Employment Opportunity ("EEO") office, complaining of race, gender, and age discrimination by the CRS. *Id.* at 14 (Am. Compl. ¶ 61). Gorecki alleges that Monteiro, Taylor, Barksdale, and Ratliff all learned of her EEO filing in October 2022, when they were contacted to be interviewed as part of the process. *Id.* (Am. Compl. ¶¶ 62–63).

Although Monteiro rejected Gorecki's request to be reinstated in her prior position, Gorecki applied for the posted Regional Director position and was interviewed on November 8, 2022. *Id.* at 15 (Am. Compl. ¶ 65). The interview panel was composed of Ratliff, Taylor, and Barksdale, whom, Gorecki alleges, Monteiro had directed to score African American applicants, "particularly young African American males," the highest. *Id.* According to Gorecki, Taylor

then proceeded to sabotage her interview. *Id.* at 15–16 (Am. Compl. ¶ 70). First, on the day of the interview, Taylor falsely accused Gorecki of having violated the DOJ telework policy as part of a "conspiracy" with CRS Administrative Assistant Melissa Simmons. *Id.* at 15 (Am. Compl. ¶¶ 66–68). Simmons quit her job on the spot in protest of Taylor's "harassment." *Id.* (Am. Compl. ¶ 69). Then, during the interview itself, Taylor asked Gorecki "smirking" questions about professional integrity and related values. *Id.* at 15–16 (Am. Compl. ¶ 70). When Gorecki nonetheless emerged from the application process (which involved both an interview and a written exercise) as the highest-scoring applicant, Monteiro ordered Ratliff to throw out the entire applicant list, and to decline to select anybody for the job. *Id.* at 16 (Am. Compl. ¶¶ 72–73). Ratliff did so, but that same day she resigned from her CRS Deputy Director position. *Id.* (Am. Compl. ¶ 73). Monteiro appointed Barksdale to replace her in an acting capacity, without inviting Gorecki (who possessed superior experience) to apply, at which point CRS's leadership was entirely composed of African American employees. *Id.* at 16–17 (Am. Compl. ¶¶ 75–77).

Gorecki continued with the EEO process and filed a formal complaint on January 3, 2023. *Id.* at 2 (Am. Compl.); *see* Dkt. 1-3. Gorecki also filed another request to be restored to the Regional Director position on that date, which was rejected. Dkt. 13-2 at 19 (Am. Compl. ¶ 89). When Monteiro learned of the formal complaint, he assigned Taylor to serve as Gorecki's first-line supervisor. *Id.* at 17 (Am. Compl. ¶ 79). Gorecki alleges that Taylor proceeded to "bombard[] [her] with work at all hours of the night," adding hundreds of hours' worth of additional assignments, and also berated Gorecki for not responding to communications outside of work hours. *Id.* (Am. Compl. ¶¶ 80–81). Another white subordinate of Taylor, Theressa Segovia, received similar treatment, while Vince Plair, an African American employee, was exempted. *Id.* at 17–18 (Am. Compl. ¶ 82). On March 15, 2023, Taylor resurfaced her prior,

false accusation that Gorecki had violated the CRS telework policy and issued Gorecki a "Letter of Reprimand." *Id.* at 20 (Am. Compl. ¶ 91). Gorecki responded by filing an administrative grievance, which Barksdale oversaw despite Gorecki's request for a different grievance official. *Id.* (Am. Compl. ¶ 92). Barksdale ultimately informed Gorecki that the letter of reprimand was never placed in Gorecki's file but did not allow Gorecki to verify that assertion. *Id.* (Am. Compl. ¶ 93).

Gorecki further alleges that this pattern of "abuse and harassment," *id.* at 22 (Am. Compl. ¶ 100), continued even after Monteiro resigned from the CRS in April 2023 and was replaced as Acting Director by Justin Lock, *id.* at 20 (Am. Compl. ¶ 94). Lock falsely criticized Gorecki's previous performance as a Regional Director at an all-staff conference, *id.* at 21 (Am. Compl. ¶ 95), and Barksdale repeatedly sent Gorecki "harassing emails" objecting to Gorecki's tone in workplace correspondence, *id.* (Am. Compl. ¶¶ 96–97). Gorecki ultimately resigned from the CRS on May 15, 2023. *Id.* at 22 (Am. Compl. ¶ 100). The CRS did not attempt to hire a replacement for her supposedly high-priority environmental justice and disabilities SME position. *Id.* (Am. Compl. ¶ 103). After her resignation, the CRS ultimately selected Kenneth Bergeron, an African American man, to serve as the new Regional Director for Region V. *Id.* at 23 (Am. Compl. ¶ 106).

The DOJ continued to process Gorecki's EEO complaint until August 2024, when Gorecki informed the department's Complaint Adjudication Office that she had decided to proceed in district court instead. *Id.* at 3 (Am. Compl.); *see* Dkt. 1-10. Gorecki filed this suit against the Attorney General in November 2024, asserting claims under Title VII and the ADEA. *See generally* Dkt. 1 (Compl.). Defendant moved to dismiss the complaint in its entirety, *see* Dkt. 9, and Gorecki opposed the motion, *see* Dkt. 12, and sought leave to file an amended

7

complaint, *see* Dkt. 13.  The Court granted Plaintiff's motion to amend, which mooted the then-pending motion to dismiss.  *See* Dkt. 17.  In her amended complaint, Plaintiff asserts the following claims:

First, Gorecki alleges that she was constructively discharged from the DOJ on the basis of her race and gender in violation of Title VII (Counts I and II), Dkt. 13-2 at 25–26 (Am. Compl. ¶¶ 113–26), and on the basis of her age in violation of the ADEA (Count VI), *id.* at 28–29 (Am. Compl. ¶¶ 144–47).  Second, she alleges that the department reassigned her from her Regional Director position on the basis of her race and gender in violation of Title VII (Counts III and IV), *id.* at 26–28 (Am. Compl. ¶¶ 127–38), and on the basis of her age in violation of the ADEA (Count VII), *id.* at 29 (Am. Compl. ¶¶ 148–51).  Third, she alleges that she was subjected to a hostile work environment on the basis of her race and gender in violation of Title VII (Count V).  *Id.* at 28 (Am. Compl. ¶¶ 139–43).  Fourth, she alleges that the DOJ retaliated against her for filing her EEO complaint in violation of both Title VII and the ADEA (Counts VIII and IX).  *Id.* at 29–31 (Am. Compl. ¶¶ 152–64).

In response, Defendant renewed her motion to dismiss in part.  *See* Dkt. 18.  Notably, the Attorney General does not move to dismiss Plaintiff's discriminatory reassignment claims under Title VII (Counts III and IV) but argues that all other claims should be dismissed for failure to state a claim.  Dkt. 18-1 at 7.  That motion is now fully briefed, *see* Dkt. 19; Dkt. 20, and is ripe for decision.

## II. LEGAL STANDARD

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) "test[] the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  This examination requires the Court to "first 'tak[e] note of the elements a plaintiff must plead to state

[the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  That "facial plausibility" standard requires that the plaintiff "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  A plaintiff need not make "detailed factual allegations" to withstand a Rule 12(b)(6) motion, *Twombly*, 550 U.S. at 555, but "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Iqbal*, 556 U.S. at 678 (citation modified).  Thus, a complaint may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (citation modified).

### III.  ANALYSIS

#### A.    Discriminatory Reassignment

The Court begins with Gorecki's claim that she was unlawfully reassigned from her Regional Director position.  As noted above, Defendant has not moved to dismiss Counts III and IV of the operative complaint, in which Gorecki alleges that the DOJ reassigned her from her position on the basis of her race (Count III) and gender (Count IV) in violation of Title VII.  Dkt. 18-1 at 7; *see* Dkt. 13-2 at 26–28 (Am. Compl. ¶¶ 127–38).  Defendant does, however, seek to dismiss Gorecki's separate claim that she was reassigned based on her age (Count VII) in violation of the ADEA.  Dkt. 18-1 at 24–29; *see* Dkt. 13-2 at 29 (Am. Compl. ¶¶ 148–51).

The ADEA prohibits the federal government from discriminating against its employees aged forty or older on the basis of age, 29 U.S.C. § 633a(a), and claims brought under that statute are generally resolved using "the same approach . . . as [in] Title VII cases," *Wilson v. Cox*, 753

F.3d 244, 247 (D.C. Cir. 2014).  Because the relevant provision of the ADEA broadly declares that "personnel actions affecting [federal] employees . . . shall be made free from any discrimination based on age," 29 U.S.C. § 633a(a), the D.C. Circuit has held that a plaintiff need not show that her age was a but-for cause of a challenged employment action, only that "any amount of discrimination taint[ed] a personnel action," *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010); *see also Townsend v. United States*, 236 F. Supp. 3d 280, 300 (D.D.C. 2017).  To prevail on an ADEA discrimination claim against a federal employer, the plaintiff must establish (1) that she suffered an adverse employment action, *Sagar v. Mnuchin*, 305 F. Supp. 3d 99, 108 (D.D.C. 2018), and (2) that her "age was *a* factor in the employer's decision," *Ford*, 629 F.3d at 206 (emphasis in original).

The first element—a qualifying adverse employment action—requires only brief discussion.  Plaintiff alleges that she was transferred from her position as a CRS Regional Director to a less desirable SME position with fewer responsibilities.  Dkt. 13-2 at 10 (Am. Compl. ¶¶ 38–39).  Defendant, correctly, does not dispute that this reassignment qualifies as an adverse employment action, *see generally* Dkt. 18-1 at 24–29.  *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("adverse employment action" includes "reassignment with significantly different responsibilities" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024).  Accordingly, the only question is whether Plaintiff has met her burden of plausibly alleging that her transfer "gives rise to an inference of discrimination."  *Townsend*, 236 F. Supp. 3d at 297 (quoting *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006)).  "At the motion to dismiss stage, . . . an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext."

*Id.* at 298.  Instead, "the guiding lodestar is whether, assuming the truth of the factual allegations . . . the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported."  *Id.* (citing *Nurridin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016)).

Plaintiff identifies only a handful of factual allegations in support of her claim of an age-discriminatory transfer.  *See* Dkt. 19 at 24–26.  First, she alleges that sometime around May 2022 Monteiro promoted Lock—who, "at the time was approximately [41] years old"—to a GS-15 Chief of Staff position without posting the job or allowing Gorecki or any other female candidate to apply, despite her superior qualifications.  Dkt. 13-2 at 6–7 (Am. Compl. ¶¶ 19–20).  Second, she alleges that Monteiro "consistently made remarks about older staff members."  *Id.* at 23 (Am. Compl. ¶ 107).  Specifically, she highlights an October 26, 2022, all-staff conference at which Monteiro objected to "the old staff poisoning the new staff," *id.* (Am. Compl. ¶ 108), praised a "young, African American male[]" for having "lived experience" and "understand[ing] what it is like to live in the communities we serve," *id.* at 24 (Am. Compl. ¶ 109) (citation modified), and applauded a "youth advocate" for being "in his twenties and therefore" better able to "relate to the people on the ground because he was the same age" as community members served by the CRS, *id.* (Am. Compl. ¶ 111).

Defendant contests Monteiro's intent in making those statements, Dkt. 18-1 at 28, but the Court concludes that those allegations, if read in the light most favorable to Plaintiff, permit a reasonable inference at the pleading stage that Monteiro, in general terms, praised characteristics of younger employees and, implicitly or explicitly, critiqued older employees for having negative attitudes and being unable to relate to certain communities.  It is less clear, however, how those statements connect to Gorecki's transfer from her Regional Director position.  As a general rule, "isolated" comments "unrelated to the relevant employment decision" are an insufficient basis

from which to infer discrimination, if not accompanied by other allegations. *Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016). For example, in *Arnold v. Speer*, 251 F. Supp. 3d 269 (D.D.C. 2017), the Court held that allegations that the plaintiff had been "called out" and "laughed at because of his age" were insufficient to create a plausible inference that his employer's decision not to promote him was motivated by age-based discrimination, as the plaintiff had not "allege[d] more specific facts that lay out what happened, who was involved (including, *e.g.*, *the age of the person who was actually promoted*), and how such conduct constitutes age discrimination," *id.* at 273 (emphasis added).

Gorecki does not allege that, following her transfer, her previous responsibilities were consistently given to younger CRS employees.[2] She does, however, allege that Lattimer, the third person to take over her Regional Director responsibilities in an acting capacity, is "younger than" she is. Dkt. 13-2 at 11 (Am. Compl. ¶ 42). And, as discussed above, she alleges that Lock, who was also younger than Gorecki, was fast-tracked to a GS-15 Chief of Staff position and that Gorecki was not given an opportunity to apply for that position. *Id.* at 6–7 (Am. Compl. ¶¶ 19–20). Although Plaintiff is not directly challenging the DOJ's refusal to offer her an opportunity to apply for that role as an instance of age discrimination, *see id.* at 29 (Am. Compl. ¶¶ 148–51), and, instead, merely portrays Lock's preferential treatment as offering support for her claims of race and gender discrimination, *id.* at 6–7 (Am. Compl. ¶¶ 16–20), that allegation

---

[2] Although outside the pleadings, Defendant represents that Kenneth Bergeron—who was ultimately chosen as the new Region V Regional Director—is more than 14 years *older* than Plaintiff and that two of the three individuals who took over Plaintiff's positions in an acting capacity—Synthia Taylor and Derrick Dean—are also *older* than Gorecki. Dkt. 18-1 at 29. Plaintiff does not dispute those assertions in her opposition to the motion to dismiss. *See* Dkt. 19 at 23–26.

does offer supporting context for Plaintiff's claims that Monteiro intended to discriminate against older employees.

Although a close question, the Court concludes that Plaintiff has proffered enough (albeit, just barely enough) to proceed with her ADEA claim that her transfer from her Regional Director position was motivated at least in part by age discrimination—that is, that age was "*a* factor" in Monteiro's decision to reassign her. *Ford*, 629 F.3d at 206 (emphasis in original). Reading the complaint in the light most favorable to Gorecki, she has alleged that Monteiro was the decisionmaker and that he expressed hostility to older employees, had previously given preferential treatment to a younger employee at Gorecki's expense, and replaced Gorecki, at least in part, with a younger employee. Plaintiff will need much more to survive a motion for summary judgment on the question. But she has alleged enough to survive a motion to dismiss.

The Court will, accordingly, deny Defendant's motion to dismiss Plaintiff's age-discriminatory transfer claim (Count VII).

## B.    Hostile Work Environment

The Court next considers Plaintiff's claim that she was subjected to a hostile work environment on the basis of her race and gender in violation of Title VII. Dkt. 13-2 at 28 (Am. Compl. ¶¶ 139–43). To state a claim of a hostile work environment in violation of Title VII, a plaintiff must allege "that [her] employer subjected [her] to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citation modified) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In considering whether the alleged misconduct rises to the level of a hostile work environment, the Court must consider the "totality of the circumstances, including the frequency of the [alleged] discriminatory conduct, its severity, its offensiveness, and whether it [allegedly]

13

interfere[d] with an employee's work performance." *Id.*  The bar for demonstrating a hostile work environment is "a high one." *Nichols v. Young*, 248 F. Supp. 3d 1, 9 (D.D.C. 2017).  The analysis includes a subjective standard, which asks whether the plaintiff "subjectively perceive[d] the environment to be abusive," and an "objective" component, which is evaluated "from the perspective of a reasonable person in the plaintiff's position." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) (citation modified) (first quoting *Harris*, 510 U.S. at 21; and then quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998)).  As the Supreme Court has cautioned, the standard for hostility is "sufficiently demanding" so that "Title VII does not become a general civility code," and that courts may "filter out complaints attacking the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation modified).

As discussed above, Plaintiff alleges, among other things, that she was stripped of supervisory responsibilities; removed from the CRS interview panel; assigned menial, administrative tasks such as "provid[ing] maintenance updates on the phones[,] maintain[ing] the services for the cable television," and "answering the telephones;" falsely accused of violating the DOJ telework policy; "bombarded" with "abrupt and rude" messages assigning work outside normal hours or expectations; had her requests for reimbursements for meeting expenses denied; was "extremely humiliat[ed]" when her supervisors did not "participate substantively" in a meeting she had organized; had the quality of her previous work falsely criticized during a staff conference; and was criticized for her tone in workplace emails.  Dkt. 13-2 at 10–12, 15, 17–19, 21 (Am. Compl. ¶¶ 39–40, 47–48, 66, 80–81, 85, 88, 95–97).

Plaintiff's claim runs into immediate difficulty as she does not allege any evident connection between those experiences and her race or gender.  She does not allege that anyone

14

"ever made any negative statements," and certainly no objectively *offensive* statements, "relating to [Plaintiff's] or anyone else's[] race [or gender]." *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 57 (D.D.C. 2004). Plaintiff does not appear to allege any statements or other expressions of hostility towards women made by Defendant whatsoever, and the only race-related statements mentioned in the complaint—Monteiro's assertion that an African American man had "lived experience" that allowed him to better understand the communities served by the CRS, Dkt. 13-2 at 24 (Am. Compl. ¶ 109) (citation modified)—does not constitute the type of "discriminatory intimidation, ridicule, and insult" necessary to state a claim for a hostile work environment, *Kempthorne*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21). Title VII is an anti-discrimination statute, rather than a general workplace code of conduct, and courts have held that even isolated comments expressing race- or gender-based hostility are insufficient to plausibly allege a hostile work environment, let alone no such comments at all. *See, e.g.*, *George v. Leavitt*, 407 F.3d 405, 408, 416–17 (D.C. Cir. 2005) (holding multiple comments telling plaintiff to "go back to where she came from" and instances of being "shouted at," told to "shut up" and that she "should never have been hired" insufficient to state a hostile work environment claim (citation modified)); *Harris v. Wackenhut Servs., Inc.*, 419 F. App'x 1, 1–2 (D.C. Cir. 2011) (per curiam) (holding that "three racially motivated comments" towards the plaintiff over the course of a year did not amount to a hostile work environment). Similarly, although Plaintiff alleges that she was the only white woman to hold certain positions within the CRS, the fact that a plaintiff is the only member of a protected class in an office does not "suffice to make the necessary causal connection" between the plaintiff's race or gender "and the alleged mistreatment." *Singh*, 300 F. Supp. 2d at 57; *see also Bryant v. Brownlee*, 265 F. Supp. 2d 52, 65 (D.D.C. 2003) ("In the absence of some greater indicator of race or age bias, the uniqueness

15

of plaintiff's race and age in her workplace cannot substantiate a claim that plaintiff's workplace was 'permeated with discriminatory intimidation, ridicule, and insult.'" (emphasis omitted) (quoting *Harris*, 510 U.S. at 21)).

Instead, Plaintiff's hostile work environment claim rests on her allegations that her job responsibilities changed following her allegedly race- and gender-based reassignment from her Regional Director position. Dkt. 13-2 at 28 (Am. Compl. ¶ 140). But Plaintiff is already pursuing that theory of race and gender discrimination as a Title VII claim for discriminatory reassignment, *id.* at 26–28 (Am. Compl. ¶¶ 127–38), and there is no basis for reframing the same allegations as a hostile work environment claim where Plaintiff has failed to plead the essential elements of the latter.

Even if the Court were to overlook Plaintiff's failure to connect her treatment to any expressions of hostility based on her race or gender, the claim for a hostile work environment would still independently fail because she has not alleged any incidents that rise above the "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788 (citation modified). Conduct such as "occasional name-calling, rude emails, lost tempers[,] and workplace disagreements" falls well short of the high mark set by the objective hostility standard. *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015). Experiences such as having supervisors criticize the tone of her emails, Dkt. 13-2 at 21 (Am. Compl. ¶ 96), being accused of violating a telework policy, *id.* at 15 (Am. Compl. ¶ 66), and not being acknowledged in meetings, *id.* at 8 (Am. Compl. ¶ 23), while doubtlessly unpleasant, do not rise to the level of "extreme conduct" necessary to support a hostile work environment claim. *See Grosdidier v. Chairman, Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 109–10 (D.D.C. 2011) (finding that plaintiff's allegation of her employer not "interacting with her directly" coupled with a letter of "admonition" devoid of

16

objectively offensive language was not sufficiently severe or pervasive).  Instead, Plaintiff's allegations center on "work-related actions by supervisors," which are typically considered workplace grievances rather than fodder for a hostile work environment claim.  *Fields v. Vilsack*, 207 F. Supp. 3d 80, 95 (D.D.C. 2016) (citation modified); *see also Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd*, 748 F.3d 1273 (D.C. Cir. 2014) ("non-selection for a desirable position, assignment to undesirable duties, . . . and being criticized by supervisors do[es] not establish a hostile work environment").  Nor has Plaintiff plausibly alleged that these discrete incidents, involving "different people doing different things in different contexts," *Baird*, 792 F.3d at 171, amount to a "coherent hostile environment claim," *id.* at 169 (citation modified).

Plaintiff comes closest to stating a claim for hostile work environment in describing how Taylor allegedly treated her after August 15, 2022.  Dkt. 13-2 at 11–12 (Am. Compl. ¶¶ 44–48).  She alleges, for example, that "Taylor ordered [her] around like a secretary or a conciliation specialist," "made administrative demands of [her] which were at a GS-4 grade level," and ordered her to perform a series of menial tasks, like reporting to the General Services Administration ("GSA") on "vehicles" in the region, providing "maintenance updates on the phones" and "maintain[ing] the services for the cable television," reporting "on the Xerox machines," calling "GSA to make sure the office was vacuumed and cleaned[,] packing and unpacking boxes[,] and shipping packages to Washington, D.C," "answering the telephones," and shredding documents.  *Id.* at 12 (Am. Compl. ¶¶ 46–48).

But these allegations nonetheless fail for three reasons.  First, even if these allegations might arguably support a claim for a retaliatory hostile work environment, Plaintiff alleges that this mistreatment began in August 2022, *before* she "engaged in protected activity by filing her

17

informal EEO complaint in September[] 2022." *Id.* at 29 (Am. Compl. ¶ 153).  Second, Plaintiff's standalone hostile work environment claim alleges only race and gender discrimination, *id.* at 28 (Am. Compl. ¶ 140), and, as noted above, the complaint fails to allege any nexus between claims of race or gender discrimination and the events occurring in Chicago starting in August 2022—other than the allegation that Plaintiff had been transferred to her new position in the first place based on her race and gender.  Third, as discussed above, Plaintiff's claims of discriminatory reassignment are already proceeding in this case as challenging a separate, discrete adverse employment action, and "this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of [discrimination] into a broader hostile work environment claim." *Boone v. MountainMade Found.*, 64 F. Supp. 3d 216, 240 (D.D.C. 2014) (citation modified).  Absent some nexus with race or gender discrimination and more detailed allegations about how these menial tasks effected Plaintiff's overall work experience— distinguishable from her reassignment itself—Plaintiff has failed to clear the high hurdle for stating a hostile work environment claim.

The Court will therefore grant Defendant's motion to dismiss as to the Title VII claim for a hostile work environment (Count V).

## C.    Constructive Discharge

### 1.    *Title VII*

Plaintiff also brings claims for constructive discharge based on race and gender under Title VII.  Dkt. 13-2 at 24–26 (Am. Compl. ¶¶ 113–26).  To prove constructive discharge based on a hostile work environment, Plaintiff "must first establish a hostile [workplace] by showing behavior sufficiently severe or pervasive to alter the conditions of [her] employment." *Clemmons v. Acad. for Educ. Dev.*, 70 F. Supp. 3d 282, 306 (D.D.C. 2014) (citation modified).  Then, she "must show that the abusive working environment became so intolerable that her

18

resignation qualified as a fitting response." *Steel v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004)).

Because, as the Court discussed above, Plaintiff has failed plausibly to allege that she experienced a hostile work environment based on race or gender, beyond the reassignment that Plaintiff challenges in separate counts of her complaint, the claims that she was constructively discharged by exposure to such an environment necessarily fail as well. *See McKeithan v. Boarman*, No. 11-5247, 2012 WL 1450565, at \*1 (D.C. Cir. Apr. 12, 2012) (per curiam) ("[A]ppellant failed to state a claim of constructive discharge[] because he failed to make out an underlying predicate claim of hostile work environment."); *Nichols*, 248 F. Supp. 3d at 11.  The Court will accordingly grant the motion to dismiss as to the Title VII constructive discharge claims (Counts I–II), insofar as they allege that Plaintiff experienced an adverse employment action, distinguishable from the transfer, that would have caused a reasonable employee in her position to resign.

That does not, however, end the analysis.  Although a constructive discharge is "most often alleged in hostile-work-environment cases, almost any type of discrimination can trigger a constructive discharge." *Joyce v. Off. of Architect of the Capitol*, 966 F. Supp. 2d 15, 25 (D.D.C. 2013) (citing *Suders*, 542 U.S. at 142); *see also Suders*, 542 U.S. at 143 (describing constructive discharge based on a hostile work environment as "one subset of Title VII constructive discharge claims").  Courts have, for example, acknowledged that a failure to promote an employee can qualify as a constructive discharge if the failure to receive a promotion can objectively be described as "career-ending." *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 78 (D.D.C. 2006) (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)).  Gorecki's complaint, which alleges that a veteran attorney with substantial management experience was sidelined,

19

"stripped . . . of her supervisory responsibilities," Dkt. 13-2 at 25 (Am. Compl. ¶ 114), and asked to perform "a variety of . . . menial tasks" inappropriate for her experience and qualifications, *id.* at 12 (Am. Compl. ¶¶ 47–48), states a plausible claim that her transfer itself amounted to a constructive discharge.  The constructive discharge standard is necessarily contextual, relying on the employee's own expectations and circumstances.  *See Joyce*, 966 F. Supp. 2d at 25–26.  At least at the pleading stage, Plaintiff has plausibly alleged that a reasonable employee in her position, faced with such substantial, humiliating changes in responsibilities, had no option but to resign.  *See Bayatfshar v. ARINC, Inc.*, 961 F. Supp. 2d 206, 214 (D.D.C. 2013) ("Indeed, because the plaintiff's duties changed substantially, a reasonable factfinder could find that the plaintiff's new position was a significant demotion, and thus a constructive discharge." (citation modified)).

The Court will therefore deny the motion to dismiss the Title VII constructive discharge claims (Counts I–II), insofar as they allege that Plaintiff's transfer from her Regional Director position amounted to a constructive discharge.

2.      *ADEA*

Despite not separately asserting the predicate hostile work environment claim, Plaintiff also brings a claim for age-based constructive discharge under the ADEA.  Dkt. 13-2 at 28–29 (Am. Compl. ¶¶ 144–47).  As referenced above, the constructive discharge standard asks "whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances."  *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010).  One basis for such a conclusion is a finding that the employer "deliberately made [the plaintiff's] working conditions intolerable."  *Hill v. Gray*, 28 F. Supp. 3d 47, 61 (D.D.C. 2014) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1176 (D.C. Cir. 1981)).

As with the Title VII claim, the Court concludes that Plaintiff has not plausibly alleged that she experienced a qualifying age-based hostile work environment, separate from her transfer, that made her working conditions "intolerable," such that "resignation qualified as a fitting response." *Steel*, 535 F.3d at 695 (quoting *Suders*, 542 U.S. at 134). The precise contours of Plaintiff's allegations of age-based constructive discharge are unclear, as the operative complaint's discussion of the relevant count includes only general, conclusory allegations that "Defendant's constructive discharge of [Gorecki] was improperly based upon her age" and that her age "played a role in the Defendant's decision to [constructively] terminate her." Dkt. 13-2 at 28 (Am. Compl. ¶¶ 145–46). And even considering the complaint in its entirety, Plaintiff makes only cursory attempts to connect her treatment to any expressions of age-based hostility by her employer.

Although Monteiro's previously discussed remarks could be read as expressing a belief that older employees had negative attitudes and less familiarity with the communities served by the CRS, those statements do not amount to "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Kempthorne*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21). Moreover, as with the Title VII analysis, allegations that Gorecki was unfairly reprimanded and treated rudely by supervisors do not rise to the requisite level of hostility to require resignation as a response. *See Grosdidier*, 774 F. Supp. 2d at 109–10. The Court has ruled that Plaintiff's claim of discriminatory reassignment based on her age (barely) clears the bar under Rule 12(b)(6), but that does not mean that the reassignment, by itself, also supports a hostile work environment claim. Aside from the workplace tribulations discussed above, Plaintiff's allegations of an age-based hostile

21

work environment, resulting in constructive discharge, rely on little more than the allegations of an "illegal reassignment."  Dkt. 19 at 20, 22.

As with the Title VII claims, the Court will therefore grant the motion to dismiss as to the ADEA constructive discharge claim (Count VI) insofar as Plaintiff alleges a predicate hostile work environment but will deny the motion as to the claim that Plaintiff's age-based transfer constituted a constructive discharge.

## D.     Retaliation

Plaintiff's final two claims allege that Defendant unlawfully retaliated against her for filing an EEO complaint objecting to her reassignment, in violation of Title VII and the ADEA. Dkt. 13-2 at 29–31 (Am. Compl. ¶¶ 152–64).  Under Title VII, employers are prohibited from "discriminat[ing]" against any employees because the employee has "opposed . . . an unlawful employment practice . . . [or] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute.  42 U.S.C. § 2000e-3(a).  To state a claim for retaliation, the plaintiff must plausibly allege that "she suffered (i) a materially adverse action (ii) because . . . she had brought or threatened to bring a discrimination claim." *Kempthorne*, 550 F.3d at 1198.  "[T]he test for determining retaliation under the ADEA and Title VII is identical."  *Tomasello v. Rubin*, 167 F.3d 612, 619 (D.C. Cir. 1999).

Defendant does not dispute that Gorecki's EEO complaint, which alleged "race, gender, and age discrimination," Dkt. 13-2 at 14 (Am. Compl. ¶ 61), constitutes protected activity under Title VII and the ADEA, Dkt. 18-1 at 33.  The sole dispute, therefore, is whether Plaintiff has alleged that she was subject to a materially adverse action that was plausibly taken in retaliation for her EEO activities.  "Title VII's anti-retaliation provision . . . applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm."  *Muldrow*, 601 U.S. at 348 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

22

In the operative complaint, Gorecki alleges that, shortly after Monteiro and Ratliff first learned of her EEO complaint, the CRS "began a baseless investigation into alleged misconduct by [Gorecki] regarding her timekeeping" and also "began to harass and abuse [Gorecki]" by "assigning her tasks unrelated to her fake program manager job," issuing a letter of reprimand, "not responding to [Gorecki's] grievance contesting the [letter of reprimand]," and denying her opportunities to speak to the CRS Director.  Dkt. 13-2 at 29–30 (Am. Compl. ¶¶ 155–56, 162–63).  She further alleges that her workload was tripled "with irrelevant and non-jurisdictional work," as well as repeating the claim that she was subject to a hostile work environment.  *Id.* at 30–31 (Am. Compl. ¶¶ 156, 163).

Several of those allegations do not meet the threshold for a materially adverse action.  For example, Plaintiff alleges that she was falsely accused of violating the CRS telework policy, which ultimately resulted in a letter of reprimand.  *Id.* at 20 (Am. Compl. ¶ 91).  Plaintiff concedes, however, that she was told that the letter was "never placed in [her] file," and, while she was not able to verify the fact, she does not actually allege that the letter *was* placed in her permanent file.  *Id.* (Am. Compl. ¶ 93).  The mere initiation of an investigation into an employee's performance, without any substantive consequences, typically does not constitute a materially adverse action.  *See Jones v. Castro*, 168 F. Supp. 3d 169, 180 (D.D.C. 2016).  Similarly, a letter of reprimand that does not result in "future punishment" also fails to clear the bar.  *See Hyson v. Architect of the Capitol*, 802 F. Supp. 2d 84, 102 (D.D.C. 2011); *see also Herbert v. Architect of the Capitol*, 766 F. Supp. 2d 59, 75 (D.D.C. 2011) (finding that a letter of reprimand describing the employee's failure to perform duties as directed and accusing the employee of unprofessional and discourteous conduct was not materially adverse).  Plaintiff does not allege that any further consequences resulted from the letter.  Nor do general "disagreements

about management policies" suffice. *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70 (D.D.C. 2012).

Plaintiff's allegation that her workload was tripled, however, does plausibly allege a materially adverse action. The D.C. Circuit has held that substantially increasing an employee's workload can give rise to a retaliation claim, as a reasonable employee "might well be dissuaded from filing an EEO complaint if she thought her employer would retaliate by burying her in work." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010). Although not every increase in workload necessarily qualifies, Plaintiff's allegation that the CRS "tripl[ed] her workload with irrelevant and non-jurisdictional work," Dkt. 13-2 at 22 (Am. Compl. ¶ 100), is enough at the pleading stage to create a reasonable inference that she faced a sufficiently "onerous" retaliatory increase in her responsibilities to qualify as a materially adverse action, *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 197–98 (D.D.C. 2014).

Plaintiff has also plausibly alleged that she received this treatment in retaliation for her EEO activity. Although the timing is not entirely clear, Plaintiff's complaint, when read in the light most favorable to her claims, suggests that this harassment started around 30 days after her supervisors learned of the EEO complaint. Dkt. 13-2 at 29–30 (Am. Compl. ¶¶ 155–56). While always a contextual inquiry, a lag of only one or two months between the protected activity and the adverse action would be well under the three-month period that decisions in this district have treated as "approaching the outer limit" of when temporal proximity may give rise to a reasonable inference of discrimination. *Greer v. Bd. of Trs. of the Univ. of D.C.*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015) (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012)). Notably, Defendant's motion to dismiss does not argue that such treatment, if it qualified as

24

materially adverse, would not support a plausible inference of retaliation.  *See* Dkt. 18-1 at 30–33.

In Plaintiff's opposition to the motion to dismiss, she further argues that the CRS's failure to rehire her for her old position—by, she alleges, rigging the interview process to ensure that she was not selected—also supports her retaliation claim.  Dkt. 19 at 27.  There is no doubt that refusing to hire Gorecki for the Regional Director position would qualify as a materially adverse action under Title VII and the ADEA.  The operative complaint, however, does not mention that failure to hire in support of either of Gorecki's retaliation claims.  Dkt. 13-2 at 29–31 (Am. Compl. ¶¶ 155–56, 162–63).  Instead, it only discusses Gorecki's extra workload, the investigation into her timekeeping, mishandling her grievance, and other alleged misfeasance. *Id.*  The Court agrees with Defendant that Gorecki's complaint, therefore, cannot fairly be read to assert a claim of retaliation based on her non-selection for the Regional Director post.  Dkt. 20 at 19.  Plaintiff objects that the complaint does reference the CRS's refusal to rehire her in the narrative portion of the document and then, in the counts dealing with retaliation, states that all prior paragraphs "are realleged and reincorporated herein."  Dkt. 13-2 at 29–30 (Am. Compl. ¶¶ 152, 159); Dkt. 19 at 27.  But such "shotgun pleading" fails to comport with Rule 8's requirement that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), which is intended "to give fair notice" to the defendants "of the claim being asserted," *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1997). That is particularly the case where, as here, Plaintiff does explicitly reference other, specified incidents of alleged adverse actions that she presents as anchoring her retaliation claims.

The Court will therefore deny the motion to dismiss as to the retaliation claims (Counts VIII–IX) but will not construe the complaint as alleging that the CRS's refusal to rehire Gorecki

25

was retaliatory.  If Plaintiff wishes to proceed under that theory, she must file a motion for leave

to amend her complaint under Rule 15.

**CONCLUSION**

For the foregoing reasons, Defendant's partial motion to dismiss, Dkt. 18, is hereby

**GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  March 31, 2026